**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CLEON L. FRANKLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:20-cv-02812-JPM-tmp |
| v. | ) | |
| | ) | |
| SHELBY COUNTY BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Before the Court is Defendant Shelby County Board of Education's ("SCBE") Motion for Summary Judgment, filed on October 4, 2021.  (ECF No. 40; Memorandum, ECF No. 40-1.) Plaintiff Cleon L. Franklin ("Mr. Franklin") filed a Response in Opposition to Defendant's Motion for Summary Judgment on November 3, 2021.  (ECF No. 48.)  On, November 17, 2021, Defendant filed a Reply.  (ECF No. 60.)  For the reasons discussed below, Defendant's Motion for Summary Judgment is hereby GRANTED.

**I.     BACKGROUND**

*A.  Factual Background*

This employment discrimination and retaliation action arises out of Defendant SCBE's alleged termination[1] of Plaintiff.  (Compl., ECF No. 1 ¶¶ 31–43.)  Plaintiff is a black male.

---

[1] Plaintiff contends that he was terminated (ECF No. 48 at PageID 550 ¶ 28) (citing ECF No. 49-13), while Defendant contends that Plaintiff was placed on unpaid administrative leave and then resigned (ECF No. 60-1 ¶ 1.) (citing ECF No. 49-2 at PageID 476, 497.)  The Court finds that Plaintiff has created a factual dispute as to whether he was terminated by Defendant but at times refers to the relevant adverse employment action as termination and at times as placement on unpaid leave.  The Court's analysis is not dependent on any distinction between the two.

(Defendant's Statement of Undisputed Material Facts, "Def. SUMF," ECF No. 41 ¶ 2.)  Plaintiff began employment with SCBE, the public school district for Shelby County, Tennessee, in 2002 as a teacher and obtained tenure in 2005.  (Id. ¶¶ 2–3.)  From 2011 until his employment with SCBE terminated in 2018, Plaintiff held the position of Director of Virtual Schools and Online Learning ("Director of Virtual Schools").  (Id. ¶ 4.)  As Director of Virtual Schools, Plaintiff: (1) "oversaw the Memphis Virtual School" ("MVS"), a fulltime online school for sixth- through twelfth-graders and adults working toward a high-school diploma; (2) "oversaw approximately 14 blended learning schools"; (3) was "in charge of the district's credit recovery program where students who had failed a course could" retake that course online[2]; and (4) helped the "college careers technology and education department to integrate technical courses in grades as early as kindergarten." (Franklin Dep., ECF No. 41-1 at PageID 297–99.)

Most of the remaining material facts are disputed.  The Court discusses in the sections that follow whether the Parties' evidence creates a dispute for trial as to the facts as they arise throughout the analysis.  Plaintiff contends that in May 2018, he told his supervisor, Dr. Terrence Brown ("Dr. Brown") that he and his wife, Anasa Franklin ("Mrs. Franklin"), were going to sue SCBE and that Dr. Brown responded, "That type of shit will get you fired."  (Def. SUMF, ECF No. 41 ¶ 32.)  Defendant contends that this exchange never occurred.  (ECF No. 40-1 at PageID 270; Def. SUMF, ECF No. 41 ¶ 32.)  Plaintiff also contends that immediately following the alleged exchange and through July 2018, Dr. Brown and, in some cases, Dr. Brown's direct supervisor, Dr. Joris Ray ("Dr. Ray"), the Assistant Superintendent of Academic Operations (Def. SUMF, ECF No. 41 ¶ 6–7), left Plaintiff out of meetings, denied him a periodic check-in, made him conduct inventory, which was someone else's job, and "openly harassed [him] about

---

[2] Plaintiff contends in his response to Defendant's SUMF that he was also in charge of the credit advancement program, but he cites no evidence of this other than his own affidavit and has thus failed to create a factual dispute in this regard.  (ECF No. 48-1 ¶ 5.) (citing ECF No. 49-1 ¶ 11.)

speaking out against late enrollments and his refusal to change grades."[3]  (ECF No. 48 at PageID 549–50 ¶ 18, 20, 22, 24–27.) (citations omitted.)  Plaintiff also contends that, on June 13, 2018, he received an "email announcement from Drs. Brown and Ray that MVS was under investigation and to stop all VS movement."[4]  (Id. at PageID 549 ¶ 21.) (citing ECF No. 49-22; ECF No. 49-1 ¶ 49.)

On August 10, 2018, Chantay Branch ("Ms. Branch"), Defendant's Employee Relations Director, who was "responsible for investigating allegations of misconduct by SCBE employees" (Def. SUMF, ECF No. 41 ¶ 8), sent an email to Plaintiff (see ECF No. 49-25).  In the email, Ms. Branch states, "In June 2018, Dr. Brown and Dr. Ray requested that I investigate the culture and climate of Virtual Schools due to some reports of inappropriate behavior. As a result of the request, I interviewed the leadership team of virtual schools."  (Id.)  During her investigation, in July 2018, Ms. Branch interviewed the following individuals who Plaintiff had supervised: Katrina Creswell ("Ms. Creswell"), an academic manager; Scott Holcomb ("Mr. Holcomb"), a former learning management support advisor who was no longer employed by SCBE at the time of his interview; Renea Brown ("Ms. Brown"), a course design associate in the Virtual Schools Department who subsequently also provided a written statement to Ms. Branch; Debra Wallace ("Ms. Wallace"), the then-acting operating manager in the Virtual Schools Department; and Lisa White ("Ms. White"), who also provided a written statement.  (Def. SUMF, ECF No. 41 ¶¶ 9–13.)  As a whole, Ms. Branch's interview notes and the statements from Ms. Brown and Ms. White allege that Plaintiff often made demeaning comments to his staff, called them the "N"

---

[3] Plaintiff additionally claims that "[o]n May 24, 2018, Brown told Plaintiff that 'they' were talking about firing the Director (Plaintiff) but he did not know who 'they' were."  (citing ECF No. 49-1 ¶ 40.) Plaintiff, however, cites no support for this contention other than his own affidavit.

[4] Dr. Brown's email reads, "Good Afternoon all, Because we are in the middle of a review of MVS, as well as its components, I think it would be best to suspend any other transitions until we have an approved plan for 2018 – 2019."  (ECF No. 49-22.)

word on various occasions and used other profanity, and failed to adequately manage his team. (See id.) (citations omitted.) (See also ECF No. 41-2 at PageID 489–96; ECF No. 41-4 at PageID 505–06.)  Four out the five interviewees alleged or otherwise referenced an incident in which Plaintiff called either Mr. Holcomb specifically "n[----]r" / "n[---]a" or all of his staff in attendance "n[----]rs" / "n[---]as"; Mr. Holcomb stated that he was not a "n[----]r" / "n[---]a" or that he was offended by the comment; and Plaintiff began to explain the "N" word's meaning. (See ECF No. 41-2 at PageID 489, 492–93, 495–96; ECF No. 41-4 at PageID 505.)  The fifth interviewee, Ms. Wallace, also noted that Plaintiff called his team "[d]umb n[---]as"; it is unclear if this was in regard to the same purported event.  (ECF No. 41-2 at PageID 494.)

Ms. Brown additionally provided Ms. Branch with a recording of a meeting in which Plaintiff "(1) admits to yelling at and cussing out his subordinates (11:20 mark); (2) uses profanity (12:40/23:00 mark); and (3) uses the racial slur 'n[----]r' (21:00 mark)."  (Def. SUMF, ECF No. 41 ¶ 35.) (citations omitted.)

Following Ms. Branch's interviews, on July 18, 2018, Ms. Branch and Employee Relations Manager Michael Woods ("Mr. Woods") met with Plaintiff "regarding the allegations against him."  (Id. ¶ 14.)  During the meeting, Plaintiff stated "that he did not recall using racial epithets with his subordinates.  Later in the meeting, Plaintiff stated that he did not intend to use 'n[---]a in a derogatory manner.'"  (Id.)  Plaintiff contends that, as a result of an SCBE-organized professional development training with John Norris ("Mr. Norris") in June 2017, Plaintiff "implemented 'safe spaces' where [he] and his staff could openly discuss personal biases and ways to eradicate them from the workplace in a judgment free environment"; he asserts that all of his comments "were made during a safe space meeting in November 2017."  (ECF No. 48 at PageID 548–49 ¶ 15, 561.)

During the July 18, 2018 meeting, Ms. Branch told Plaintiff that she was going to recommend to the Superintendent that Plaintiff be terminated. (Def. SUMF, ECF No. 41 ¶ 15.) (citing Branch Dep., ECF No. 41-2 at PageID 477.) (See also ECF No. 41-2 at PageID 481.) The reasons for the termination were that Plaintiff engaged in conduct unbecoming a member of the teaching profession through his inappropriate comments and behavior that he demonstrated with his staff and leadership failures, i.e., lack of systems, protocols, processes.  (Id.) (citing Branch Dep., ECF No. 41-2 at PageID 477.)  "Plaintiff's use of racial epithets with his staff factored into Ms. Branch's recommendation because such slurs are inappropriate for any SCBE employee and especially so for high-level employees such as directors."  (Def. SUMF, ECF No. 41 ¶ 16.) (citing Branch Dep., ECF No. 41-2 at PageID 477:2-21.)

Defendant asserts that "[o]n July 23, 2018, Ms. Branch sent Plaintiff a letter confirming that he had been placed on [unpaid] administrative leave effective July 19, 2018, and that a recommendation to dismiss him as a tenured teacher would be made to SCBE's board."  (Id. ¶ 17.)  (citing ECF No. 41-2 at PageID 476; id. at PageID 497.)  Plaintiff responds that, in the July 18, 2018 meeting, Ms. Branch "gave Plaintiff an ultimatum to resign or be terminated. Her letter of July 23, 2018 was a contradiction of my termination on July 18, 2018 and was not a confirmation of administrative leave."  (ECF No. 48-1 ¶ 17.) (citing ECF No. 49-13.)  "On August 23, 2018, Plaintiff sent an email to Ms. Branch and others indicating that he was resigning his employment with SCBE."  (Def. SUMF, ECF No. 41 ¶ 20.)  (citing ECF No. 41-1 at PageID 320–21; id. at PageID 350–51.)

A white male, Vinson Thompson ("Mr. Thompson") was hired to replace Plaintiff as Director of Virtual Schools.  (Id. ¶ 21.)

B.  *Procedural Background*

On December 21, 2018, Plaintiff filed charges of race and gender discrimination and retaliation against Defendant with the Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 22.)  Plaintiff received a right to sue letter from the EEOC dated August 12, 2020.  (ECF No. 1-1.)  On November 10, 2020, Plaintiff commenced this action.  (Compl., ECF No. 1.) Plaintiff's Complaint alleges gender discrimination, race discrimination, and retaliation in violation of Title VII.  (Id. ¶ 37–39.)  On October 4, 2021, Defendant filed a Motion for Summary Judgment.  (ECF No. 40; Memorandum, ECF No. 40-1.)  Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment on November 3, 2021.  (ECF No. 48.) On November 17, 2021, Defendant filed a Reply Brief in Support of Its Motion for Summary Judgment.  (ECF No. 60.)

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense."  Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the non-moving party."  Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact."  Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material

fact." Mosholder, 679 F.3d at 448–49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587. "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 914 (6th Cir. 2013) (quoting Chapman v. UAW Local 1005, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted).

In order to "show that a fact is, or is not, genuinely disputed," a party must do so by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or showing "that an adverse party cannot produce admissible evidence to support the fact." L.R. 56.1(b)(3); Bruederle, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); see also Mosholder, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting Celotex, 477 U.S. at 325)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Martinez, 703 F.3d at 914 (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" Pharos Capital Partners, L.P. v. Deloitte & Touche, 535 Fed. Appx. 522, 523 (6th Cir. 2013) (per curiam) (quoting Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008), abrogation recognized by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015)).

The decisive "question is whether 'the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 251-52). Summary judgment "'shall be entered' against the non-moving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" Rachells v. Cingular Wireless Employee Servs., LLC, No. 1:08CV02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990)). "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 251). "[I]n order to withstand a motion for summary judgment, the party opposing the motion must present 'affirmative evidence' to support his/her position." Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992) (citing Liberty Lobby, 477 U.S. at 247-254; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)). "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." Rachells, 2012 WL 3648835, at *2 (quoting Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d 890, 894 (7th Cir. 2003)). Statements contained in an affidavit that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient. See Mitchell, 964 F.2d at 584-85.

## III.   ANALYSIS

Defendant seeks summary judgment on Plaintiff's Title VII claims of race discrimination, gender discrimination, and retaliation. (ECF No. 40 at PageID 253.) In employment

discrimination cases brought under Title VII, courts apply the <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) burden-shifting framework. <u>See, e.g.</u>, <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651, 659 (6th Cir. 2000). Under <u>McDonnell Douglas</u>, Plaintiff "bears the initial burden of establishing a prima facie case of discrimination." <u>Jackson v. VHS Detroit Receiving Hosp., Inc.</u>, 814 F.3d 769, 776 (6th Cir. 2016) (citing <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381, 391 (6th Cir. 2008)). After the plaintiff makes out his prima facie case, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." <u>Id.</u> (quoting <u>White</u>, 533 F.3d at 391). "If the defendant meets this burden, 'the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination.'" <u>Id.</u> (quoting <u>White</u>, 533 F.3d at 391–92). Plaintiff's retaliation claim is likewise assessed under the <u>McDonnell Douglas</u> framework. <u>See</u> <u>Laster v. City of Kalamazoo</u>, 746 F.3d 714, 730 (6th Cir. 2014) (citing <u>Imwalle v. Reliance Med. Products, Inc.</u>, 515 F.3d 531, 538 (6th Cir. 2008)). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." <u>Cline</u>, 206 F.3d at 661. Defendant asserts that Plaintiff has failed to make out prima facie cases of gender discrimination and retaliation and that all of Plaintiff's claims fail because Plaintiff, in any case, cannot show that Defendant's asserted reason for terminating Plaintiff was pretextual. (ECF No. 40-1 at PageID 263, 274.) The Court analyzes the <u>McDonnell Douglas</u> stages, in turn, vis-à-vis Plaintiff's three claims.

A.  *Prima Facie Case*[5]

i.     <u>Sex Discrimination Claim</u>

---

[5] Defendant does not dispute on summary judgment that Plaintiff can establish a prima facie case of race-based discrimination. (ECF No. 40-1 at PageID 256 n.2.) Therefore, the Court addresses whether Plaintiff has met his prima facie burden with respect only to his sex discrimination and retaliation claims.

Defendant first contends that Plaintiff cannot establish a prima facie case of sex discrimination.  (ECF No. 40-1 at PageID 263.)  To make out a prima face case of sex discrimination under Title VII, "a plaintiff must show that he (1) is a member of a protected class; (2) was qualified for the job or promotion sought; (3) experienced an adverse employment action; and (4) was replaced by someone outside the protected class."  Simpson v. Vanderbilt Univ., 359 F. App'x 562, 568 (6th Cir. 2009) (citing Arendale v. City of Memphis, 519 F.3d 587, 603 (6th Cir. 2008) (further citations omitted)).  In cases of reverse discrimination, such as this one, the Sixth Circuit requires a plaintiff to "demonstrate[e] that he was intentionally discriminated against 'despite his majority status.'"  Arendale, 519 F.3d at 603 (quoting Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985) (further citation omitted)).  Accordingly, the Circuit has "modified the first and fourth prongs of the traditional prima facie test."  Id. at 569 (citing Leadbetter v. Gilley, 385 F.3d 683, 690 (6th Cir. 2004)).  Thus, to meet the first prong, a male plaintiff who alleges sex discrimination must "demonstrate background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority."  Id. (quoting Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 614 (6th Cir. 2003) (internal quotation marks and further citation omitted)).  To meet the fourth prong, the plaintiff must "show that the defendant treated differently employees who were similarly situated but were not members of the protected class."  Id. (quoting Sutherland, 344 F.3d at 614).  For purposes of summary judgment, SCBE does not dispute that Plaintiff has met prongs two and three but asserts that Plaintiff "cannot establish the first and fourth prongs of his gender discrimination claim."  (ECF No. 40-1 at PageID 264, 264 n.6.)

### *Prong 1—Background Circumstances*

Defendant contends that Plaintiff "has not identified any background circumstances (in his Complaint or otherwise) indicating that SCBE 'is that unusual employer who discriminates against' males." (ECF No. 40-1 at PageID 264.) (quoting Leadbetter, 385 F.3d at 690.)  Plaintiff "cannot meet his burden" to show the requisite background circumstances, Defendant asserts, "[b]ecause the investigation of Plaintiff's conduct was initiated by males and because Plaintiff was replaced by a male."  (Id.)  Plaintiff responds that background circumstances are established by: (1) Defendant's differential treatment of complaints against Plaintiff, a male, and complaints against Dr. Heidi Ramirez[6] ("Dr. Ramirez"), a female, and (2) the fact that a female, Ms. Branch, took the adverse employment action against Plaintiff.  (ECF No. 48 at PageID 554–55.)

The Court cannot accept Plaintiff's first proffered "background circumstance."  The Sixth Circuit has held that, while a contrast in treatment between majority and minority employees may constitute sufficient background circumstances, a plaintiff's "own situation cannot provide that contrast, for it would make little sense to say that the instant claim is itself a key part of the 'background circumstances' against which it is evaluated."  Treadwell v. Am. Airlines, Inc., 447 F. App'x 679 (6th Cir. 2011).  Plaintiff offers only his "own situation" as evidence of differential treatment by Defendant of male and female employees; this is insufficient to establish the element of background circumstances.

Plaintiff's second alleged "background circumstance" fairs better, however.  In reverse race discrimination cases, "[t]he mere fact that a racial minority took an adverse action against [a white] [p]laintiff is sufficient to satisfy the background circumstances requirement."  Leavey v. City of Detroit, 467 F. App'x 420, 425 (6th Cir. 2012) (citing Arendale, 519 F.3d at 603 (citing Zambetti v. Cuyahoga Cmty. Coll., 314 F.3d 249, 257 (6th Cir. 2002))).  See also Treadwell, 447

---

[6] Dr. Ramirez is "a Hispanic female who was employed [with SCBE] as Chief Academic Officer from [November 17, 2014] to her resignation on June 30, 2017."  (Plaintiff's Statements of Additional Material Facts, "Pl. SAMF," ECF No. 48-2 ¶ 10.)  She will be discussed in more detail below.

F. App'x at 678 (stating that previous litigants had met the "background circumstances" requirement through "evidence that the person responsible for the employment decision was a minority") (citing Zambetti, 314 F.3d at 257).  District courts in this Circuit "have since differed on whether Zambetti's holding applies in the reverse sex discrimination context, such that evidence that a decision maker is a member of the minority sex is sufficient to establish background circumstances."  Snyder v. Ohio Dep't of Rehab. and Corr., No. 2:14-cv-300, 2016 WL 7852524, at *3 (S.D. Ohio July 19, 2016) (emphasis added) (citing Becker v. Elmwood Sch. Dist., No. 3:10 CV 2487, 2012 WL 13569, at *7 (N.D. Ohio Jan. 4, 2012); Porubsky v. Macomb Cmty. Coll., No. 10-13591, 2012 WL 2803765, at *5–6 (E.D. Mich. July 10, 2012)).  The Court finds that, given that a plaintiff's burden at the prima facie stage is "minimal," Brown v. Lexington-Fayette Urban Cnty. Gov't, 483 F. App'x 221, 225 (6th Cir. 2012) (citing EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997)), Plaintiff may establish background circumstances based on a showing that the "decision maker is a member of the minority sex." Snyder, 2016 WL 7852524, at *3.  Here, Plaintiff asserts that Ms. Branch, who is female, took an adverse employment action against Plaintiff by terminating him.  (ECF No. 48 at PageID 555.) Defendant does not dispute that Ms. Branch was the relevant decisionmaker in Plaintiff's case.[7] (see ECF No. 40-1 at PageID 264–65, 269.)  Thus, the Court finds that Plaintiff has met the background circumstances requirement for purposes of making out his prima facie case on summary judgment.

### Prong 4—Different Treatment of Similarly Situated Employees

---

[7] Defendant states that background circumstances are not met because Plaintiff "contends that two males, Dr. Joris Ray and Dr. Terrence Brown, were responsible for initiating the investigation that led to adverse action being taken against him.  A male and a female, Michael Woods and Chantay Branch, participated in the meeting in which Plaintiff was placed on administrative leave without pay."  (ECF No. 40-1 at PageID 264.)  Defendant, however, does not explicitly dispute that Ms. Branch was the "decision maker" in Plaintiff's case and in fact argues later, regarding Plaintiff's retaliation claim, that Ms. Branch was the "relevant decisionmaker."  (See id. at PageID 269.)

Defendant contends that Plaintiff has failed to "establish . . . that similarly situated females were treated more favorably than he was." (Id. at PageID 265.) Specifically, Defendant claims, "Plaintiff is not similarly situated to any of the[] three female employees" who Plaintiff stated were "accused of creat[ing] toxic work environments and were not terminated." (Id. at PageID 266.) (citing Def. SUMF, ECF No. 41 ¶ 29.) These three employees were Dr. Ramirez, Dr. Patricia Toarmina, and Marjorie Douglas. (Id.) (citing Def. SUMF, ECF No. 41 ¶ 30.) Plaintiff responds that he and "female comparator[] Heidi Ramirez were similarly situated in all relevant respects." (ECF No. 48 at PageID 556.) As Plaintiff does not mention the other two female employees, the Court will assess the fourth prong with respect to Dr. Ramirez only.

Courts consider three factors in determining whether employees are "similarly situated" for purposes of this prong: whether the employees (1) "dealt with the same supervisor," (2) "have been subject to the same standards," and (3) "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Jackson, 814 F.3d at 777 (quoting Mitchell, 964 F.2d at 583). The Sixth Circuit has clarified that a plaintiff need not "demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself . . . must be similar 'in all of the relevant aspects.'" Id. (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (further citation omitted)). "Courts . . . should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Goza v. Memphis Light, Gas & Water Div., 398 F. Supp. 3d 303, 326 (W.D. Tenn. 2019) (quoting Ercegovich, 154 F.3d at 352) (also citing Jackson v. FedEx Corp. Servs., Inc., 518 F.3d 388, 396 (6th Cir. 2008)

("cautioning against an 'exceedingly narrow' formulation of the similarly situated standard and requiring a 'true independent determination of the relevant factors'")). Therefore, "the weight to be given to each [Mitchell] factor can vary depending upon the particular case." Johnson v. Kroger Co., 319 F.3d 858, 867 (6th Cir. 2003) (citing Ercegovich, 154 F.3d at 352).

Defendant asserts that Plaintiff cannot "show that he and his comparator[] had the same supervisor" because Plaintiff "reported to Dr. Antonio Burt" while Dr. Ramirez was "directly supervised by Superintendent Hopson" as part of Superintendent Hopson's cabinet.  (ECF No. 40-1 at PageID 266.) (citing Def. SUMF, ECF No. 41 ¶ 31.)  Plaintiff responds that "[w]hen performing the aspect of his employment regarding 'district wide initiatives,['] Plaintiff and Ramirez shared the supervision of Superintendent Hopson and the School Board."  (ECF No. 48 at PageID 558.) (citing ECF Nos. 49-3–49-6.)  Plaintiff's cited exhibits include, *inter alia*, (1) an email sent by Superintendent Hopson in January 2017 to recipients including both Plaintiff and Dr. Ramirez, in which Superintendent Hopson provides information about an upcoming team meeting, and Plaintiff's Outlook acceptance of the meeting (ECF No. 49-3); and (2) an email sent by Dr. Burt to Plaintiff in September 2017, directing Plaintiff to prepare "one-pagers" that "will provide [] Superintendent [Hopson] with talking points" for an upcoming Board Work Session and Business Meeting (ECF No. 49-6).  Defendant replies that Plaintiff never testified in his deposition that Superintendent Hopson was his direct supervisor and asserts for the first time in his Response to Defendant's Motion for Summary Judgment "that he believes he reported directly to Superintendent Hopson."  (ECF No. 60 at PageID 866.)  Defendant further contends that Plaintiff's proffered emails "taking directives from his then-direct supervisors and other individuals, not Superintendent Hopson," and the "fact that Superintendent Hopson sent [an]

email to several individuals, including non-employees" inviting them to a meeting, do not "establish[] that Superintendent Hopson directly supervised Plaintiff." (Id. at PageID 867.)

The Court agrees with Defendant that it is troubling that Plaintiff testified as to his supervisors and never mentioned Superintendent Hopson. (See ECF No. 60-2 at PageID 888–96.) Instead, Plaintiff testified that between January of 2017 and around the summer of 2017, Plaintiff successively reported to Dr. Sharon Griffin, Dr. Patricia Toarmina, and Dr. Antonio Burt, and then to Dr. Brown. (Id. at PageID 892–93.) Viewing the evidence in the light most favorable to Plaintiff, however, the Court finds that the email from January 2017 shows that Plaintiff reported to Superintendent Hopson in a supervisory capacity. Superintendent Hopson states in the email that participants in the upcoming meeting would "begin working as a team to articulate a shared academic vision, identify the priorities and strategies that will help us meet that vision and determine measurable goals to track our progress for the next 6 to 18 months." (ECF No. 49-3.) Viewed in the light most favorable to Plaintiff, the email establishes Superintendent Hopson as the team leader setting the meeting agenda, with Plaintiff (and Dr. Ramirez) under his supervision during the relevant time period. Thus, the first Mitchell factor weighs in Plaintiff's favor.

Plaintiff next asserts that "Plaintiff and Ramirez were subject to the same standards of conduct as outlined in 4002 and 4010, Staff Ethics and Harassment of Employees, respectively." (ECF No. 48 at PageID 558.) (citing ECF No. 41-5 at PageID 508–11.) Defendant does not dispute this factor. (See ECF No. 40-1 at PageID 265–67; ECF No. 60 at PageID 866–70.) Having reviewed the cited portions of the record, the Court agrees with Plaintiff and weighs this factor in Plaintiff's favor.

Defendant next contends that "Plaintiff did not engage in the same conduct as his comparator[]." (ECF No. 40-1 at PageID 266.)  Specifically, Defendant asserts that "Plaintiff was determined to have directed racial slurs at his subordinates, exhibited dysfunctional leadership, and made abrasive and inappropriate comments (including using profanity) to his subordinates." (Id.)  Meanwhile, Defendant asserts, "[w]hile complaints were made against Dr. Ramirez, Dr. Ramirez was never accused of using racial slurs or profanity with other SCBE employees." (Id.)  Plaintiff responds that he was "terminated for 'allegedly' using the 'N' word, using profanity, and creating a toxic work environment," while Dr. Ramirez was "not terminated despite complaints of sexual harassment; using profanity; demeaning employees by suggesting that they engaged in an affair; calling her employees dumb; and/or the general creation of a hostile work environment." (ECF No. 48 at PageID 559.)  Plaintiff contends that Dr. Ramirez's complaints of sexual harassment of a subordinate and Plaintiff's complaints of use of the "N" word is the "classic 'six in one hand half dozen in the other' comparison." (Id.)  Plaintiff further asserts that "[i]f Plaintiff's conduct violated policy [specifically, Policy Nos. 4002 and 4010] so too did the documented conduct of Heidi Ramirez." (Id.)

Under the third factor, a plaintiff need not "show that his proposed comparator's actions were identical to his own." Jackson, 814 F.3d at 777 (quoting Colvin v. Veterans Admin. Med. Ctr., 390 F. App'x 454, 459 (6th Cir. 2010)).  Instead, the comparator's actions must have been "of 'comparable seriousness' to the conduct for which Plaintiff was discharged." Id. (quoting Mitchell, 964 F.2d at 583 (further citation omitted)).  "[A] plaintiff cannot establish a reasonable inference of discriminatory motive based on [his] 'employer's more severe treatment of more egregious circumstances.'" Id. (quoting Clayton v. Meijer, 281 F.3d 605, 612 (6th Cir. 2002)).

The Court finds that Dr. Ramirez's conduct was of comparable seriousness and sufficiently equivalent to Plaintiff's to meet this factor. Written complaints made against Dr. Ramirez allege that she yelled at her staff, accused them of lying, and interrupted them in front of their subordinates; displaced blame onto her staff, purported to welcome "pushback" but "refus[ed] to listen to criticism/alternatives," and insinuated that an employee could quit if she did not like Dr. Ramirez's leadership style; told third parties that her staff were dumb, could not do their jobs, and did not give her support; and told an employee they weren't "as smart as people thought." (ECF No. 49-11 at PageID 670, 672–73, 679.) (See also id. at PageID 676 ("Dr. Ramirez looks for every opportunity she can to either make you feel bad about yourself or look bad in front of another colleague or another superior.").) Likewise, the complaints lodged against Plaintiff during Ms. Branch's investigation allege that he "would rant and rave and disrespect the room" (ECF No. 41-2 at PageID 489); yelled at (id. at PageID 492, 494) and interrupted his staff (id. at PageID 490) and called them liars (id. at PageID 493); criticized and suggested employees would be terminated for their mistakes (id. at PageID 489, 495–96); and called his staff dumb and said monkeys could do their work (id. at PageID 494, 496). The complaints against Plaintiff refer to the working environment as "toxic" (id. at PageID 493, 495), while the complaints against Dr. Ramirez state that with Dr. Ramirez's arrival, the environment changed from "warm [and] friendly" to one in which "people were afraid to talk to each other . . . for fear of retaliation." (ECF No. 49-11 at PageID 677).

Further, the complaints against both Plaintiff and Ramirez allege leadership failures. Plaintiff's complaints allege poor planning without consulting his team (ECF No. 41-2 at PageID 490), that he had "checked out and could care less about the status of the department" (id. at PageID 491); that he "could no longer manage the team" due to a lack of boundaries (id. at

PageID 494); and a lack of "systems, processes and/or procedures" and lack of leadership (id.; see also id. at PageID 496). (See also id. at PageID 489 ("[Plaintiff] never really delegated [and] just had expectations with no clear directions for his employees.").) Meanwhile, the complaints against Dr. Ramirez also allege leadership failures. (See ECF No. 49-11 at PageID 675 ("I have lost faith in Dr. Ramirez's ability to lead her team."); id. at PageID 676–77 (alleging that Dr. Ramirez would consistently get another employee to give instruction and once kept her team waiting for two hours for materials that she was supposed to deliver to them for an event); id. at PageID 677 (alleging that Dr. Ramirez used grant funds that her team told her were not allowed to be used).)

Finally, the complaints against Plaintiff allege that Plaintiff used profanity with his staff and called them the "N" word or otherwise used the "N" word in speech (ECF No. 41-2 at PageID 489, 492–96), while the complaints against Dr. Ramirez allege comments of an inappropriate sexual nature (ECF No. 49-11 at PageID 673–74). In particular, the complaints against Dr. Ramirez allege that she insinuated to other staff that two of her staff members were having an affair, made "inappropriate comments of a sexual/romantic nature" to Dr. Ray, and made inappropriate sexual jokes in a principals meeting. (Id.)

Defendant replies that Plaintiff and Dr. Ramirez are not similarly situated because Plaintiff's conduct was "more serious than Dr. Ramirez's alleged conduct[;] Plaintiff has produced no evidence showing that the allegations against Dr. Ramirez were substantiated," unlike the allegations against Plaintiff; Dr. Ramirez was disciplined by Superintendent Hopson while Plaintiff was disciplined by Ms. Branch; and Plaintiff's and Dr. Ramirez's "conduct took place during different times." (ECF No. 60 at PageID 869.) First, the Court declines to say that as a matter of law Plaintiff's use of the "N word" is more serious or egregious than Dr.

Ramirez's sexual harassment and finds the remaining conduct comparable as well.  As Plaintiff notes, both sets of behavior would seemingly violate the standards of conduct and disciplinary policies to which both Plaintiff and Dr. Ramirez were subject.  (See ECF No. 49-8.)  The Court additionally finds that the fact that different individuals disciplined Plaintiff and Dr. Ramirez and at different times is not determinative as to whether Plaintiff and Dr. Ramirez engaged in the "same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Jackson, 814 F.3d at 777 (quoting Mitchell, 964 F.2d at 583).  As Plaintiff notes, Ms. Branch "was [] aware of" the discipline that Dr. Ramirez had received.  (ECF No. 48 at PageID 564.)  (See also ECF No. 49-12 (email from Ms. Branch to Dr. Ramirez informing her of the discipline that Superintendent Hopson was imposing on her).)  See Redlin v. Grosse Pointe Pub. Sch. Sys., 921 F.3d 599, 611 (6th Cir. 2019) (quoting Seay v. Tenn. Valley Auth., 339 F.3d 454, 479–80 (6th Cir. 2003)) ("We have previously held that a plaintiff satisfied th[e] [similarly situated] element, despite being disciplined by a different supervisor than his comparator, where those who disciplined the plaintiff 'were well-aware of the discipline meted out' to his comparator.").[8]  Finally, the Court finds that while some of the allegations against Plaintiff are substantiated in a recording and through Plaintiff's own admissions, the lack of definitive proof of the allegations against Dr. Ramirez does not prevent Plaintiff from meeting this factor; Defendant clearly found the allegations sufficiently legitimate to merit mandatory sexual harassment and sensitivity training. (See ECF No. 49-12.)

In addition to the three Mitchell factors discussed above, Plaintiff and Defendant also discuss Plaintiff's and Dr. Ramirez's respective positions and job responsibilities in arguing

---

[8] The Sixth Circuit has held this to be the case even where Plaintiff and the comparator had different supervisors, thus making the first factor somewhat less relevant in this case.  See Seay, 339 F.3d at 480.

whether they were similarly situated.  (See ECF No. 40-1 at PageID 266; ECF No. 48 at PageID 558; ECF No. 60 at PageID 867–68.)   The Court agrees that, like the three Mitchell factors above, Plaintiff's and Dr. Ramirez's respective responsibilities are relevant to Defendant's disciplinary decisions and thus to whether Plaintiff and Dr. Ramirez were similarly situated. Defendant contends that Plaintiff and Dr. Ramirez are not similarly situated because Dr. Ramirez worked in a different department, had a different job title, was higher ranking, "had dramatically different responsibilities," and had a significantly higher salary.  (ECF No. 40-1 at PageID 267; ECF No. 60 at PageID 867.)   Plaintiff admits that Dr. Ramirez had a different title (Chief Academic Officer) and was a higher ranking employee who worked in a different department (ECF No. 48-1 ¶ 31), but he responds that Plaintiff and Dr. Ramirez were both "top level employees at SCBE" and that in his role of "leading and being directly responsible for district-wide initiatives[,] . . . Plaintiff's duties were the same or similar to Heidi Ramirez's duties in all relevant aspects."  (ECF No. 48 at PageID 558).  Defendant replies that, while Plaintiff tries in his response affidavit to "improperly inflate his responsibilities," Plaintiff's responsibilities, as accurately described in his deposition, "did not come close to Dr. Ramirez's duties to oversee SCBE's overall academic program."  (ECF No. 60 at PageID 869.)  Defendant also contends that Plaintiff appears to improperly rely on the "current job description for SCBE's currently vacant Chief Academic Officer position" rather than on "Dr. Ramirez's actual job description."  (ECF No. 60-1 ¶ 9.) (citing ECF No. 60-3.)

Plaintiff's more specific and extended description of his duties, responsibilities, and projects in his affidavit does not necessarily conflict with the more general description of his responsibilities in his deposition.  (See ECF No. 49-1 ¶ 3–29; ECF No. 41-1 at PageID 297–99.) However, Plaintiff's affidavit is devoid of citations to any evidence that would confirm

Plaintiff's asserted duties.  (See ECF No. 49-1 ¶ 3–29.)  Plaintiff does, however, cite exhibits in his Statements of Additional Material Fact, which he purports support his asserted responsibilities and participation in "district wide initiatives."  (ECF No. 48-2 ¶ 7, 9.)  These include the email from Superintendent Hopson discussed above (see ECF No. 49-3), which indicates that Plaintiff and Dr. Ramirez both "supported the academic direction of [the] district" and engaged in "leadership and innovation," and emails suggesting that Plaintiff held a leadership role in a Shelby County Schools initiative with Comcast and AT&T involving broadband services (see ECF No. 49-5).  It is also undisputed that the Department of Online Learning was at times "aligned to the Academics Department."  (ECF No. 60-1 ¶ 5.)  Plaintiff additionally cites the Position Description of his role from Memphis City Schools.  (See ECF No. 49-9.)  The General Summary in the Description reads:

> The Director of Virtual Learning manages the progress of approximately 10,000 students enrolled in online courses o[n] a part-time basis, approximately 350 students enrolled on a full-time basis, approximately 150 teachers delivering instruction in an online environment, approximately 50 non-certified tutors to assist students to learn in a mixed model environment. This person also manages the District's transition to blended learning in 18 schools, affecting approximately 12,000 students, 800 teachers, and 170 school/district administrators.  He or she will also oversee the work of the Academic Operations Manager, the Systems Operations Manager, two Learning Management Systems Advisors, and the Enrollment Specialist to ensure usernames and password[s] for students, teachers, and parents at all schools are created in a timely and efficient manner, class shells are functional, data reports are end-user friendly, and all students meet instructional objectives as prescribed by State of Tennessee course requirements.

(ECF No. 49-9 at PageID 663.)  Meanwhile, the Job Type Description from 2014 for the position that Dr. Ramirez was hired to fill reads:

> Responsible for the district's overall academic program, including the creation, planning, evaluation and improvement of educational programs and curriculum. In overseeing all policies and programs related to student instruction, the CAO supports schools and holds them accountable for academic performance. The Chief Academic Officer will oversee the functions of alternative schools; career and technical education; curriculum; English Language Learners; federal programs; guidance counseling; optional schools; science, technology, engineering, and math education; and special education.

(ECF No. 60-3 at PageID 901.)  It is undisputed on summary judgment that "Plaintiff's position as Director of Virtual School was unique in that he was the only Director who was also a Principal." (ECF No. 60-1 ¶ 3.)

At the prima facie stage, the Plaintiff's burden of production for proving he and another employee were similarly situated is relatively low, and courts should not place a "rigid" emphasis on "job functions," lest "'a plaintiff whose job responsibilities are unique to his . . . position" be hindered from ever "successfully establish[ing] a *prima facie* case.'" Jackson, 518 F.3d at 394 (quoting Ercegovich, 154 F.3d at 353).  Based on the overarching similarities between Plaintiff's and Dr. Ramirez's positions, and the uniqueness of Plaintiff's role, the Court finds that this factor does not, at the prima facie stage, defeat Plaintiff's claim that he and Dr. Ramirez were similarly situated.

Looking to all of the factors discussed, the Court finds that Plaintiff has established a factual dispute as to whether he and Ramirez were similarly situated for purposes of the fourth prong of his prima facie case.  The Court therefore finds that Plaintiff has made out a prima facie case of sex discrimination.

ii.     Retaliation Claim

Defendant asserts that "Plaintiff cannot establish a prima facie retaliation claim."  (ECF No. 40-1 at PageID 267.)  To establish a prima facie retaliation case under Title VII, a plaintiff must show that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Laster, 746 F.3d at 730 (quoting Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007) (internal citation omitted); Burlington N. &

Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–68 (2006)).  Defendant contends that Plaintiff has failed to prove prongs one, two, and four of his retaliation claim.  (ECF No. 40-1 at PageID 267.)

### Prong 1—Protected Activity

Defendant contends that Plaintiff's asserted protected activity, namely, his statement to Dr. Brown that Plaintiff and his wife were going to sue Defendant, is too vague to constitute activity protected under Title VII.  (Id. at PageID 267–69.)  Plaintiff responds simply that he "engaged in protected activity when he told his supervisor that he and his wife were thinking of suing the District."  (ECF No. 48 at PageID 565.)  Plaintiff asserts in his Complaint that Defendant's adverse action against Plaintiff violated the "opposition clause" of Title VII "because [Plaintiff] opposed an unlawful employment practice."  (ECF No. 1 ¶ 39.)

Title VII's "opposition clause" makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made [] unlawful . . . by [Title VII]."  42 U.S.C. § 2000e-3(a).  "A plaintiff's objection to an employment practice is protected activity if [his] supervisors 'should have reasonably understood that [he] was making a complaint of sex discrimination."  Mumm v. Charter Township of Superior, 727 F. App'x 110, 112 (6th Cir. 2018) (quoting Braun v. Ultimate Jetcharters, LLC, 828 F.3d 501, 512 (6th Cir. 2016)).  Therefore, "a complaint must allege unlawful discrimination rather than general unfairness."  Id.  Moreover, "a complaint need not be 'lodged with absolute formality, clarity, or precision.'"  Id.  (quoting Yazdian v. ConMed Endoscopic Techs., Inc., 793 F.3d 634, 645 (6th Cir. 2015)).  However, "Title VII does not protect an employee . . . if his opposition is merely a 'vague charge of discrimination.'"  Yazdian, 793 F.3d at 645 (quoting Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989)).  "'When an employee communicates to [his] employer a belief that the employer has engaged in . . . a form of employment discrimination,

that communication' virtually always 'constitutes the employee's *opposition* to the activity.'"
Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 276 (2009)
(citation omitted).

The Court finds that Plaintiff has met the "protected activity" prong when viewing the
evidence in the light most favorable to him.  While the Court agrees that Plaintiff's "[t]elling his
supervisor that he and his wife were thinking of suing the District" (ECF No. 48 at PageID 565)
would be too vague to constitute protected activity, Plaintiff has asserted elsewhere in the record
that he made more specific statements.  Plaintiff states in an affidavit attached to his Response, "I
stopped by Dr. Brown, Dr. Generette, and Mrs. White and informed [them] that my wife and I
were suing SCS for sexual harassment."  (ECF No. 49-1 ¶ 35.)  Defendant replies that, per the
"sham affidavit rule," Plaintiff cannot "'manufacture a sham fact issue'" with an "'affidavit that
conflicts[, or is in tension,] with [his] earlier testimony about the fact.'"  (ECF No. 60 at PageID
863.) (quoting Boykin v. Family Dollar Stores of Mich., LLC, 3 F.4th 832, 842 (6th Cir. 2021).)
Defendant contends that "Plaintiff never testified that he told Dr. Terrence Brown that he and his
wife were suing for sexual harassment" (ECF No. 60 at PageID 864) and cites deposition
testimony in which Plaintiff was asked, "[W]here you say you told Dr. Brown that your wife was
filing a lawsuit, what specifically did you tell Dr. Brown?" and Plaintiff responded, "That Anasa
and I were suing."  (Id.) (citing Def. SUMF, ECF No. 41 ¶ 32.)  Defendant thus argues, "Only
after SCBE filed its motion for summary judgment did Plaintiff attempt to revise his recollection
of the conversation to add 'for sexual harassment' because Plaintiff recognizes that a general
statement that a party is considering filing a lawsuit does not constitute protected activity."  (Id.)
Plaintiff's response to Defendant's Motion for Summary Judgment was not the first time
Plaintiff alleged making a more definite statement, however.  In particular, in his Complaint,

Plaintiff states, "Plaintiff engaged in protected activity when he told the Defendant about him and his wife's intent to file a lawsuit of discrimination against the Defendant."  (ECF No. 1 ¶ 40.)   The Court finds that, despite the discrepancy between the terms "harassment" and "discrimination," Plaintiff had already alleged a particularized complaint to Dr. Brown, and his affidavit therefore does not evince an intent to create a fact issue where none previously existed. Based on the alleged statement in Plaintiff's affidavit (as well as that in his Complaint), the Court finds that Plaintiff has created a factual dispute as to whether his complaint was sufficiently definite to constitute protected activity.   Plaintiff has therefore met this prong for purposes of summary judgment.

### *Prong 2—Knowledge by Defendant*

Defendant asserts that even if he succeeds on the first prong, "Plaintiff cannot show that the relevant decisionmaker was aware of [Plaintiff's] purported protected activity."  (ECF No. 40-1 at PageID 269.)   Namely, Defendant claims that Plaintiff has failed to show that Ms. Branch was aware of Plaintiff's allegedly protected activity before she placed him on administrative leave without pay.  (Id.)  Plaintiff responds that contradictions in Ms. Branch's statements/emails allegedly evincing her "efforts to conceal the fact that Joris Ray was involved in soliciting an investigation of Plaintiff"[9]; the fact that Ms. Branch allegedly did not follow

---

[9] In an August 2018 email from Ms. Branch to Plaintiff, Ms. Branch wrote, "In June 2018, Dr. Brown and Dr. Ray requested that I investigate the culture and climate of Virtual Schools due to some reports of inappropriate behavior. As a result of the request, I interviewed the leadership team of virtual Schools."  (ECF No. 49-25.)  In deposition testimony, Ms. Branch stated that she opened the investigation because she received an allegation from the leadership of staff complaints regarding Plaintiff.  (ECF No. 49-24 at PageID 699.)  When asked who she meant by "the leadership," she responded, "Generette – Docia Generette, Mr. Brown."  (Id.)  When asked why she did not include Dr. Generette in her email, the following exchange occurred:

> A: I don't know why I didn't include her at that time, but I actually met with Dr. Brown and Dr. Generette.
> Q: And when did you meet with Dr. Ray?
> A: I did not meet with Dr. Ray.
> Q: How did Dr. Ray request the investigation into the culture and climate of Virtual Schools?
> A: He instructed Dr. Brown to connect with me.  That was my understanding.
> Q: Who told you that?
> A: Dr. Brown.

SCBE disciplinary procedure (Policy 4055) in terminating Plaintiff; other allegedly retaliatory actions taken against Plaintiff by Dr. Brown and Dr. Ray; and Ms. Branch's involvement in Plaintiff's wife's previous complaints of discrimination compel the inference that Ms. Branch knew of the protected activity.  (ECF No. 48 at PageID 564–65; ECF No. 48-1 ¶ 38.)

"[D]irect evidence of [] knowledge or awareness is not required, and . . . a plaintiff may survive summary judgment by producing circumstantial evidence to establish this element of [his] claim."  Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002).  "Circumstantial evidence can support a reasonable inference of the decisionmaker's knowledge if the evidence is comprised of 'specific facts' and not merely 'conspiratorial theories,' 'flights of fancy, speculations, hunches, intuitions, or rumors.'"  Evans v. Prof'l Transp., Inc., 614 F. App'x 297, 300 (6th Cir. 2015) (quoting Mulhall, 287 F.3d at 552 (further citation omitted)).  The Sixth Circuit has "found circumstantial evidence sufficient to infer employer knowledge where such knowledge was the only explanation for an employer's action."  Id. at 301 (citing Allen v. Mich. Dep't of Corr., 165 F.3d 405, 413 (6th Cir. 1999); Mulhall, 287 F.3d at 552–53.)

Defendant asserts that there are no "specific facts" suggesting Branch knew of "Plaintiff's alleged May 2018 statement to Dr. Brown."  (ECF No. 40-1 at PageID 270.) Defendant contends, "As Plaintiff did not tell Dr. Brown that he or his wife were suing SCBE, Dr. Brown did not convey that information to Ms. Branch."  (Id.) (citing Def. SUMF, ECF No. 41 ¶ 38.)  As a preliminary matter, the Court finds that the conflicting testimony of Plaintiff and Dr. Brown creates a factual dispute as to whether Plaintiff made the alleged statement to Dr. Brown. (See Brown Dep., ECF No. 41-6 at PageID 514:12–14.) (Counsel: "[D]id Mr. Franklin ever say to you that, 'My wife and I are suing the district'?" Dr. Brown: "No.")  The Court

---

(Id. at PageID 700–01.)  In testimony given in March 2020, however, Dr. Generette denied that she recalled any complaints against Plaintiff.  (See ECF No. 49-27 at PageID 711 ¶ 11.) (Q: Do you recall any complaints filed against Cleon Franklin? A: No.)

cannot say the same, however, as to the issue of whether Dr. Brown told Ms. Branch about Plaintiff's statement.  Dr. Brown stated in a declaration, "I did not tell Ms. Branch that Mr. Franklin had indicated that he or his wife were considering suing SCBE."  (ECF No. 41-3 ¶ 10.) Plaintiff has failed to raise a dispute of fact with any evidence, circumstantial or otherwise, to the contrary.  In his Response to Defendant's SUMF (see ECF No. 48-1 ¶ 38), Plaintiff points to his affidavit, email exhibits, and meeting notes, but none of Plaintiff's proffered evidence suggests that Branch had knowledge, from Dr. Brown or otherwise, of his or his wife's intent to sue the district.  (See ECF No. 49-1 ¶¶ 35, 37–41, 51; ECF Nos. 49-31, 49-32, 49-34.)  Emails and meeting notes from November and December 2017 establish that Ms. Branch knew Plaintiff's wife had complained to Defendant regarding a hostile work environment and was considering transitioning to another position within Defendant's employ (See ECF Nos. 49-31, 49-34); they do not suggest that Ms. Branch had knowledge of Plaintiff's or his wife's intent to sue the district for sexual discrimination or harassment in mid-2018.

The asserted contradiction in Ms. Branch's statements and her alleged failure to follow SCBE policy on progressive discipline also do not help Plaintiff's case.  (See ECF No. 48 at PageID 565) (citing ECF No. 49-27 ¶ 11; ECF No. 49-24 at PageID 699); id. (citing ECF No. 49-35).)  First, whether Ms. Branch met with Dr. Generette and Dr. Brown on Dr. Ray's instruction to Dr. Brown or whether Ms. Branch met with Dr. Brown and Dr. Ray, neither version of events establishes that Ms. Branch had knowledge of Plaintiff's protected action, i.e., his statement to Dr. Brown, Dr. Generette, and Ms. White.  Additionally, even viewed in the light most favorable to Plaintiff, the contradictions in Ms. Branch's statements do not evidence that she attempted to conceal Dr. Ray's participation in asking Ms. Branch to begin the investigation.  Second, although Defendant has asserted that the language of Policy 4055 makes

it inapplicable to complaints of conduct addressed by Policies 4001 and 4010 (ECF No. 60 at PageID 871), even a failure by Ms. Branch to follow SCBE policy in disciplining Plaintiff would not suffice to raise an inference of knowledge about the protected activity beyond mere "speculations[] [or] hunches." Evans, 614 F. App'x at 300 (quoting Mulhall, 287 F.3d at 552 (further citation omitted)). Finally, Plaintiff's proffered evidence regarding allegedly retaliatory actions by Dr. Brown and Dr. Ray following Plaintiff's protected action (see ECF Nos. 49-20, 49-25, 49-26, 49-28) fails in any case to demonstrate knowledge by Ms. Branch.

The Court also notes that in the pretext section of his response and in his other filings, Plaintiff seems to suggest that Ms. Branch was not the only relevant decisionmaker in his case. He asserts that "the record demonstrates the orchestrated steps taken by Brown, Ray, and Branch to terminate Plaintiff." (ECF No. 48 at PageID 563.) (citing ECF No. 49-36; ECF No. 49-1 ¶ 50.) He additionally denies Defendant's assertion that Ms. Branch conducted the investigation by interviewing Plaintiff's staff, instead claiming that Ms. Branch stated, "I interviewed who Dr. Ray and Dr. Brown told me to interview." (ECF No. 48-1 ¶ 8.) (citing ECF No. 49-1 ¶ 50; ECF No. 49-15.) Nowhere in Plaintiff's exhibits, however, does Ms. Branch make this statement. Instead, Ms. Branch states in her email to Plaintiff that "[a]s a result of th[e] request" from Dr. Brown and Dr. Ray to "investigate the culture and climate of virtual Schools," she "interviewed the leadership team of Virtual Schools." (ECF No. 49-25.) (See also Branch Dep., ECF No. 49-24 at PageID 700.) (reading email aloud.) Thus, Plaintiff has not created a dispute as to the fact that Ms. Branch conducted the investigation independently following the initial request for the investigation; Plaintiff cites to nothing in the record that suggests Dr. Brown and Dr. Ray controlled the investigation. Further, Plaintiff does not dispute that Ms. Branch was the individual who terminated his employment. (See ECF No. 48 at PageID 550.) In sum, Plaintiff

has failed to create a factual dispute as to whether the relevant decisionmaker for Defendant, Ms. Branch, was aware of his protected activity at the time of the ultimate adverse employment action.

Because Plaintiff has failed to establish this prong of his prima facie case, Plaintiff's retaliation claim cannot survive summary judgment. The Court thus finds it unnecessary to address the causation prong of Plaintiff's prima facie case or whether Plaintiff has established pretext. Defendant's Motion for Summary Judgment is, therefore, GRANTED as to Plaintiff's retaliation claim.

## B. Pretext[10]

Defendant asserts that Plaintiff has failed to prove that Defendant's articulated reason for placing him on unpaid administrative leave was pretext for discrimination. (ECF No. 40-1 at PageID 274–77.) Plaintiff has the burden to show pretext, i.e., that SCBE's "explanation [for terminating Plaintiff] was fabricated to conceal an illegal motive." Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009). In the Sixth Circuit, "a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Id. (citing Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004)). The "three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" Blizzard v. Marion Tech. Coll., 698 F.3d 275, 285 (6th Cir. 2012) (citing Chen, 580 F.3d at 400

---

[10] Plaintiff does not dispute that Defendant has proffered a legitimate reason for Plaintiff's termination. (See ECF No. 48 at PageID 559.) ("The Defendant's articulated legitimate non-discriminatory reason for Plaintiff's termination is 'inappropriate and unprofessional conduct with his employees, including using racial epithets and profanity, demeaning employees by calling them stupid, sharing private medical information of one employee and generally showing a lack of leadership.[']") Therefore, the Court proceeds to the pretext stage of the McDonnell Douglas analysis.

n. 4).  Thus, a plaintiff "must produce 'sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer the defendant[] intentionally discriminated against him.'"  Simpson v. Vanderbilt Univ., 359 F. App'x 562, 569–70 (6th Cir. 2009) (citing Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003) (some internal quotation marks and further citations omitted)).  "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, [his] prima facie case is sufficient to support an inference of discrimination at trial."  Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 508 (6th Cir. 2014) (quoting Chen, 580 F.3d at 400 n.4 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993))).  The Sixth Circuit also holds, however, that "a reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."  Seeger v. Cincinnati Bell Telephone Co., LLC, 681 F.3d 274, 285 (6th Cir. 2012) (quoting St. Mary's Honor Ctr., 509 U.S. at 515 (emphases and quotation marks omitted)).  "[O]n summary judgment, '[i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage.'"  Jackson, 814 F.3d at 779 (quoting Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 812 (6th Cir. 2011)).

i.      Race Discrimination Claim

Defendant first asserts that Ms. Branch's decision to put Plaintiff on unpaid administrative leave "had a basis in fact" because Ms. Branch "separately interviewed five of Plaintiff's subordinates, who all attested to Plaintiff's inappropriate conduct," and Plaintiff could not "negate the allegations" when Ms. Branch confronted him.  (ECF No. 40-1 at PageID 274–75.)  Plaintiff contends that "Defendant's proffered reason had no basis in fact" because

"Plaintiff used the 'N' word within the confines of a 'safe space' environment." (ECF No. 48 at PageID 562.) Plaintiff asserts that such an environment, "where biases could be openly discussed and resolved[,] was sanctioned by Defendant through the invite of Mr. Norris." (Id.) (citing ECF No. 49-1 ¶ 61; ECF No. 49-29; ECF No. 49-17 at PageID 689–90.)

"For a plaintiff's challenge to the factual basis of an employer's proffered termination rationale to establish pretext, the plaintiff must provide evidence" that "the facts underlying [the] employer's allegations never occurred." Miles v. South Cent. Human Res. Agency, Inc., 946 F.3d 883, 888–89, 890 (6th Cir. 2020) (citing Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir. 2012)). Plaintiff cannot meet this burden. Defendant claims that Plaintiff was placed on unpaid leave for using profanity with and demeaning his employees, directing the "N" word at them, and leadership failures. (ECF No. 40-1 at PageID 272–73.) Defendant's proffered proof of Plaintiff's demeaning and inappropriate comments/behavior toward his staff includes: minutes of meetings with Ms. Branch (transcribed by Dr. Woods) in which Plaintiff admitted to most of this behavior (he at first denied the rape comment, but when Ms. Branch brought up his behavior in a second meeting, Plaintiff responded, "Absolutely Chantay because they were making mistakes, Chantay"; he also denies calling anyone stupid but admits to saying that an idea being discussed was stupid) (ECF No. 41-2 at PageID 479, 481, 484); statements from Ms. Brown and Ms. White stating that Plaintiff engaged in this behavior (ECF No. 41-2 at PageID 489; ECF No. 41-4 at PageID 505–06, respectively); Ms. Branch's notes from her investigational interviews with Ms. Creswell, Ms. Brown, Ms. Wallace, Mr. Holcomb, and Ms. White stating that Plaintiff made such comments and noting the "toxic" environment (ECF No. 41-2 at PageID 492–96); and a recording made by Ms. Brown during a meeting in which Plaintiff says "shit" twice and mentions that he yelled at and "curs[ed] [] out" his staff "all the time" in the past (see

ECF No. 48-1 ¶ 35 (providing URL for the recording)).  Plaintiff does not provide any evidence besides his own testimony regarding the few statements that he disputes.

Regarding Plaintiff's use of the "N" word in particular, Plaintiff does not contend that he never used the "N" word with his subordinates, but rather that he did not direct it at any employee as a racial slur and instead used it only within the context of a "safe space" training with his staff.  (ECF No. 48 at PageID 549, 563; ECF No. 48-1 ¶¶ 9, 14.)  Defendant has provided evidence to the contrary, including Ms. Brown's statement from the investigation (ECF No. 41-2 at PageID 489) (stating that Plaintiff called staff members "[i]gnorant [n---]as" and then stated that he was offended that they were offended because he did not mean "n[---]a" in a derogatory way); Ms. White's statement (ECF No. 41-4 at PageID 505) (stating that in one incident Plaintiff "referred to the whole team as the "n-word" and Mr. Holcomb was "quite offended by the statement"); and notes from Ms. Branch's investigatory interviews with Ms. Brown ("Franklin would often call everyone stupid n[---]as, liars, and utilized profanity. During a staff meeting Franklin called everyone n[---]as. Holcomb stated he was offended Franklin called him a n[---]a."), Ms. Wallace ("During a meeting, Franklin stated 'you n[---]as, my daughters can do better than this; Dumb n[---]as."), and Mr. Holcomb ("In 2017–18 school year, during a staff meeting . . . Cleon Franklin called the team 'n[---]as'. Holcomb advised he is European/Asian mixed and indicated he was offended by the statement. Franklin then provided the definition of the 'n' word. (lazy, not checking up on work, etc.)").  (ECF No. 41-2 at PageID 493, 494, 495, 496, respectively).  Further, in the recording mentioned above, Plaintiff at one point refers to everyone he is speaking to as "n[---]as."  (See ECF No. 48-1 ¶ 35 (providing URL for the recording)).

Plaintiff has failed to create a factual dispute as to whether he used the "N" word outside a "safe space" context.  In an attempt to create such a dispute, Plaintiff points to an article titled "Black woman wins civil case against black manager who used the N-word" (see ECF No. 49-18), which he claims Mr. Holcomb brought to Plaintiff "for discussion in the safe space."  (ECF No. 48 at PageID 549.)  Plaintiff, however, has not provided any evidence, other than his own testimony, suggesting that Mr. Holcomb provided him with this article for discussion.   The article is dated September 4, 2013 and states, "This article is more than 8 years old," meaning it was electronically retrieved no earlier than September 5, 2021.  (See ECF No. 49-18.)  While this fact is not conclusive evidence that Mr. Holcomb did not bring in the article (as Plaintiff could have simply re-retrieved an online copy for purposes of his exhibit), it does not bolster Plaintiff's claim that Mr. Holcomb brought in the article for discussion.  Plaintiff states, "It is clear that the 'team' discussed the article because in what other forum could Katrina Creswell freely state, 'I identify as a N[----]r.'"   (ECF No. 48 at PageID 563.)   Plaintiff, however, provides no evidentiary backing for his assertion.  Ms. Creswell did testify that identifying as the "N" word is something she would have said (though she denied remembering either Mr. Holcomb bringing in the alleged article or making such a statement).[11]   (ECF No. 49-17 at PageID 689–90.) However, even if Plaintiff has shown that he and his staff sometimes engaged in conversations about race that involved the "N" word, he has not rebutted Defendant's proof that he used the word with his employees in other, less convivial contexts.  Lastly, Plaintiff claims that his use of the "N" word was within an "environment where biases could be openly discussed and resolved," i.e., the alleged "safe space" and that his creation of such an environment was

---

[11] Plaintiff has also pointed to an exercise from the Dr. Norris training described below in which participants were to write their race, nationality, religion, gender, socioeconomic status, and generation on the back of a paper bag.  (See ECF No. 49-29 at PageID 726, 733–34.)  Even if Ms. Creswell's alleged statement were made during Plaintiff's asserted re-creation of this activity with his team, however, this does not rebut evidence of Plaintiff's use of the word in other contexts.

"sanctioned by Defendant through the invite of Mr. Norris."[12]   (ECF No. 48 at PageID 562.)
(citing ECF No. 49-1 ¶ 61; ECF No. 49-29; ECF No. 49-17 at PageID 689–90.)   Mr. Norris's
materials, when viewed in the light most favorable to Plaintiff, encourage having open
discussions around identity, including race, with employees and recognizing uncomfortable
situations in the workplace as a leader; however, as Plaintiff has conceded (see ECF No. 48-1 ¶¶
27–28), nowhere do they sanction using offensive racial epithets with one's staff.   (See
generally, ECF No. 49-29.)   Further, Ms. Creswell's testimony that "everyone had their own
voice and could speak it, and [Plaintiff] appreciated a distant voice in the room," meaning that
"[i]f someone felt as if my opinion was not right, or [there] was some way we could do things
better, they had the freedom to say so," does not suggest Plaintiff never engaged outside of a
safe-space-type context in the behavior and language alleged.   (ECF No. 49-17 at PageID 689.)
Notably, although Plaintiff cites to Ms. Creswell's testimony to bolster his claim about his safe-
space environment (see ECF No. 48 at PageID 562–63), Ms. Creswell testified that she did not
recall the term "safe space" ever being used at the school.   (Id.)

Plaintiff also has not proffered sufficient evidence to attack the factual basis of his
alleged leadership failures.   To support its assertion that there was a factual basis to this reason
for termination, Defendant points to Ms. Brown's and Ms. White's statements to Ms. Branch
during the investigation, as well as to Ms. Branch's notes from her investigatory interviews with
Ms. Brown (ECF No. 41-2 at PageID 493), Ms. Wallace (stating that there were no clear
boundaries because Plaintiff was friends with the staff and could no longer manage the team) (id.
at PageID 494), Mr. Holcomb (id. at PageID 495), and Ms. White (id. at PageID 496).   In
response, Plaintiff (1) states that he was Director of MVS from 2011 through his 2018

---

[12] Dr. John Norris was "a consultant retained by SCBE to perform professional development for SCBE's
leadership." (ECF No. 40-1 at PageID 262.)  "The purpose of Dr. Norris' training was to assist SCBE with building
a positive culture and climate, addressing biases, and dealing with adversity."  (Def. SUMF, ECF No. 41 ¶ 26.)

termination (ECF No. 48 at PageID 548) and (2) points to an email in which Mr. Holcomb forwarded to Plaintiff a Memphis Business Journal article stating that MVS had an 89.6 percent pass rate for full-time students in online courses for the 2017–18 school year and noted that MVS had placed in the top thirty public schools in Memphis for its ACT scores (ECF No. 49-16). Plaintiff also purports to quote positive evaluations from his staff in his affidavit (ECF No. 49-1 ¶ 68).  However, Plaintiff nowhere includes the (anonymous) evaluations themselves and does not provide a date for them.[13]  Even viewing Plaintiff's proffered evidence in the light most favorable to him, the fact that he remained in his job as director for several years and that MVS achieved a high pass rate, together with Plaintiff's alleged performance reviews, does not create a factual dispute as to whether Plaintiff's alleged leadership failures had a factual basis.

Plaintiff also asserts that "[t]he five (5) employee complaints alleging inappropriate language by Mr. Franklin did not exist until July 2, 11, and 16[, 2018]" and that "Debra Wallace was not an employee of Virtual School in November 2017, when Holcomb's article was discussed along with the 'N' word and its meaning" in a "safe space meeting." (ECF No. 48 at PageID 561.)  Plaintiff asserts that "all of the comments made by Plaintiff were made during" this meeting.  (Id.)  Plaintiff further asserts that he was "terminated only July 18, 2018, two days after the last 'investigative' interview."  (Id.) (citing ECF No. 49-13.)  Plaintiff's attempt to discredit the legitimacy of the investigation and complaints, however, is insufficient to raise a factual dispute regarding whether the proffered reasons for terminating Plaintiff were factually substantiated.  Even though the untimeliness of the complaints raises some concern, Defendant

---

[13] Defendant includes as an attachment to its Motion Plaintiff's EEOC statement, in which he states, "My most recent formal evaluation was performed by Chief Bradley Leon on June 31, 2016.  My performance evaluation score was 4.22 out of a possible score of 5.00.  It is included in Attachments A.  Feedback in the 'From Your Team' section included direct statements from: Mr. Ajay Kansal . . . Mr. Scott Holcomb . . . Mrs. Lisa White-Fenton . . . Ms. Katrina Creswell . . . Ms. Renea Brown."  (ECF No. 41-1 at PageID 364.)  Neither Party, however, has provided the Court with the evaluation itself.

has proffered an audio-visual recording demonstrating that Plaintiff used the "N" word and profanity outside of the alleged November 2017 "safe space" meeting.  Plaintiff, meanwhile, has not pointed to sufficient evidence refuting the complaints, untimely as they may be.

Defendant next contends that Plaintiff also cannot produce evidence that his conduct did not motivate Ms. Branch's employment action.  (ECF No. 40-1 at PageID 275.)  Plaintiff responds that Defendant's proffered reason "did not actually motivate the adverse employment action taken against Plaintiff."[14]  (ECF No. 48 at PageID 563–64.)  Plaintiff, however, appears to largely conflate his prima facie retaliation case with the pretext inquiry, discussing knowledge and causation.  (Id. at PageID 563.)  The Court has already determined that Plaintiff failed to show Ms. Branch's knowledge at the prima facie stage; thus, Plaintiff's arguments sounding in retaliation are unavailing to prove pretext on his discrimination claims.  Furthermore, Plaintiff suggests that, rather than being motivated by Defendant's asserted reason for it, the adverse employment action was part of "orchestrated steps taken by Brown, Ray, and Branch to terminate Plaintiff."  (Id.)  As discussed above, however, Plaintiff has put forward no evidence showing this to be the case.  In particular, Plaintiff points to various emails that appear to have been forwarded by Dr. Brown and Dr. Ray, respectively, to Ms. Branch on June 28, 2018 (see generally ECF No. 49-36); he claims, "On June 28th, 2018, Dr. Ray, Dr. Brown, and M[s]. Branch engaged in fact finding and searched their email accounts for any records involving me that could potentially be labeled egregious. Dr. Ray also had Dr. Burt do the same."  (ECF No. 49-1 ¶ 50.)  Plaintiff's email exhibits, however, viewed in the light most favorable to Plaintiff, show only that Dr. Ray and Dr. Brown forwarded emails to Ms. Branch regarding Plaintiff's involvement in a separate issue regarding student grades.  (Id.)  Plaintiff also suggests that the

---

[14] Defendant mistakenly states in its Reply that "Plaintiff does not argue that SCBE['s] proffered reason did not actually motivate the disciplinary action taken against Plaintiff."  (ECF No. 60 at PageID 872 n.2.)

alleged contradiction in Ms. Branch's testimony and her alleged failure to follow policy (both discussed above) establish this second factor of pretext.  To reiterate, Branch's statements do not evince the obfuscation that Plaintiff suggests they do, and even if Ms. Branch failed to follow policy, the connection between this failure and pretextual motive is no more than speculation.

Defendant finally contends that Plaintiff "cannot show that discrimination . . . [was] the real reason[] he was disciplined."  (ECF No. 40-1 at PageID 276.)  In the Sixth Circuit, "a reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."  Seeger, 681 F.3d at 285 (quoting St. Mary's Honor Ctr., 509 U.S. at 515 (emphases and quotation marks omitted)).  Even if Plaintiff has shown Defendant's reasons were pretextual, he has failed to proffer any evidence, other than the fact that he was replaced by a white man, to suggest that race-based discrimination motivated his termination.  Therefore, he has not met his burden at the pretext stage of his race discrimination claim.  See Miles, 946 F.3d at 895 (citing Alfrey v. AK Steel Corp., 211 F. App'x 393, 396 n.3 (6th Cir. 2006) ("[I]f satisfying the prima facie case requirements alone were enough to establish pretext, then the pretext prong would be superfluous.").[15]

Because Plaintiff has failed to establish a factual dispute at the pretext stage of his race discrimination claim, Defendant's Motion for Summary Judgment is GRANTED with respect to Plaintiff's race discrimination claim.

---

[15] The Court notes that Plaintiff's reliance on Asmo v. Keane, Inc. (see ECF No. 48 at PageID 561) is misplaced.  In that pregnancy discrimination case, the Court held that the supervisor's unusual silence when the plaintiff announced she was pregnant with twins and received congratulations from everyone else in attendance, combined with his failure to discuss her pregnancy or how the company could accommodate her, could be interpreted as speculation regarding how her pregnancy would affect her work; such silence thus "could be interpreted as discriminatory animus" under precedent, thereby establishing pretext at the summary judgment stage.  Asmo v. Keane, Inc., 471 F.3d 588, 594–95 (6th Cir. 2006).  Asmo stands for the proposition that an employer's conduct that flouts customary interpersonal interaction regarding a protected characteristic may itself show discriminatory intent, particular in the context of pregnancy discriminaton (see id. at 594), not that Plaintiff need not show any affirmative evidence of Defendant's discriminatory motive at all.

ii.    Sex Discrimination Claim[16]

Plaintiff's final argument as to why "Defendant's articulated reason did not actually motivate the adverse employment action taken against Plaintiff" is that Ms. Branch was "aware of the difference in treatment between Heidi Ramirez and Plaintiff."  (ECF No. 48 at PageID 564.)  Because this argument is one of disparate treatment, the Court addresses it below with Plaintiff's differential treatment argument regarding the third method of showing pretext.

As to the third avenue of showing pretext, Defendant contends that Plaintiff's actions were sufficient to motivate the employment decision because they violated both SCBE's policies and Tennessee law regarding unprofessional conduct.  (ECF No. 40-1 at PageID 275.)  Plaintiff responds that "Plaintiff's actions, even if true, were insufficient to motivate his termination by Defendant" because comparator Ramirez also allegedly engaged in inappropriate conduct but was permitted to attend sensitivity training rather than being terminated.  (ECF No. 48 at PageID 564.)  Defendant replies that Plaintiff "definitely cannot satisfy the more stringent . . . standard" that a claim of differential treatment requires at the pretext inquiry as opposed to at the prima facie stage.  (ECF No. 60 at PageID 873.)

In order to show a "genuine dispute as to pretext based on differential treatment," a plaintiff must put forward "some evidence that he was similarly situated 'in all of the relevant aspects' to an employee who lacked his protected characteristic and received preferential treatment."  Spratt v. FCA US LLC, 812 F. App'x 348, 353 (6th Cir. 2020) (quoting Redlin, 921

---

[16] The Parties' arguments regarding the two ways of demonstrating pretext discussed above also apply to Plaintiff's sex discrimination claim.  (See ECF No. 40-1 at PageID 274–76; ECF No. 48 at PageID 559–564.)  Because Plaintiff has failed to establish a factual dispute under the first avenue, the Court does not analyze the pretext stage of Plaintiff's sex discrimination claim with respect to that method.  Although Plaintiff has not put forward sufficient evidence to support the second avenue with respect to pretext for race discrimination, however, he asserts an additional argument for that method that relates to his sex-discrimination claim: that Ms. Branch was "aware of the difference in treatment between Heidi Ramirez and Plaintiff."  (ECF No. 48 at PageID 564.)  The Court addresses this argument, as well as Plaintiff's argument under the third avenue, i.e., whether Defendant's proffered reasons "were insufficient to motivate the employer's action."  Chen, 580 F.3d at 400 (citing Hedrick, 355 F.3d at 460).

F.3d at 610) (further citation omitted).  Courts apply a modified version of the Mitchell factors to determine at the pretext stage whether plaintiff and the proffered comparator were similarly situated: whether they "(1) dealt with the same supervisor; (2) were subject to the same standards, and (3) engaged in substantially identical conduct without differentiating or mitigating circumstances that would distinguish their employer's differential treatment of them."  Id. (citing Redlin, 921 F.3d at 610 (citing Mitchell, 964 F.2d at 583)) (emphasis added). The Sixth Circuit "has never held that a plaintiff and his comparator 'must commit exactly the same mistake in order to permit a reasonable inference of intentional discrimination from their differential discipline."  Id. at 354 (quoting Jackson, 814 F.3d at 782); see also Jackson, 814 F.3d at 780 (noting that the "substantially identical" language "should not be read to increase the weight of [the plaintiff's] burden of proof at the pretext stage," although the court evaluates the plaintiff's similarity to a comparator with more rigor at this stage).  The "relevant aspects" may include "the type of misconduct alleged and its relative severity," which may be gauged by the misconduct's "actual and potential consequences."  Spratt, 812 F. App'x at 354 (citing Jackson, 814 F.3d at 780, 783).  At the pretext stage, the Court continues to look to the factors it deemed relevant to the similarly situated inquiry during its prima facie analysis.  Jackson, 814 F.3d at 779.  "[A]t the pretext stage, 'the factual inquiry proceeds to a new level of specificity.' This is a change in the rigor with which [the court] evaluate[s] [the plaintiff's] similarity to [his] comparators; it is not an increase in the weight of [his] evidentiary burden."  Id. at 780 (citations omitted).

Plaintiff cannot make out a differential treatment claim at the pretext stage.  A reasonable jury could find Plaintiff's conduct substantially identical to that of Dr. Ramirez.  As discussed above, the Court agrees with Plaintiff that the differences in their conduct could reasonably be

considered a case of "six in one hand half dozen in the other." (ECF No. 48 at PageID 559.) Further, the Court has already established that Plaintiff and Dr. Ramirez were subject to the same standards and that, even if they did not report to the same direct supervisor, the individual who disciplined Plaintiff had knowledge of the disciplinary action against Dr. Ramirez. Plaintiff, however, falls short of establishing he and Dr. Ramirez were similarly situated at the pretext stage of the Court's inquiry because of the differences in his and Dr. Ramirez's positions and responsibilities. As Chief Academic Officer, Dr. Ramirez was part of the Superintendent's cabinet (Def. SUMF, ECF No. 41 ¶ 31) and was responsible for, inter alia, "driv[ing] district-wide multi-year planning and strategy for academics and instruction[,] [a]lign[ing] the Academic Office with the district's overall strategic plan[,] [and] [t]ranslat[ing] the district's vision into concrete academic benchmarks" (ECF No. 60-3 at PageID 902). She was charged with "[m]anag[ing] the district's overall portfolio of schools, including the regional offices, the process for new school development, and facility utilization changes." (Id.) She was to "[s]erve as a key contributor on the Superintendent's cabinet to set the overall vision and provide leadership to the . . . district." (Id.) Meanwhile, as Director of Virtual Schools and Online Learning, Plaintiff, inter alia, "overs[aw] the daily operations and administration of [] the mixed-model school, students taking part-time courses, and the blended learning pilot." (ECF No. 49-9 at PageID 663.) He was additionally a school principal. (Id.) He also was responsible for many aspects of the blended learning pilot, such as co-managing principals, developing trainings, conducting check-in meetings, and developing a plan as to "feasibility of a District-wide blended learning implementation." (Id. at PageID 664.)

While similarities no doubt exist between Plaintiff's and Dr. Ramirez's roles on an abstracted level—for example, both individuals oversaw school staffing and worked to ensure

school performance and student achievement (ECF No. 49-9 at PageID 663; ECF No. 60-3 at PageID 902)—Plaintiff has not provided evidence that he had the same broad district-wide responsibility and authority that Dr. Ramirez had.   Granted, Plaintiff's cited email from Superintendent Hopson states, "each of you have supported the academic direction of our district" and discusses "work[ing] as a team to articulate a shared academic vision, identify[ing] the priorities and strategies that will help us meet that vision[,] and determin[ing] measurable goals to track our progress for the next 6 to 18 months."  (ECF No. 49-3.)  The exhibits Plaintiff cites to show his participation in certain "district-wide initiatives" (ECF 48 at PageID 558) (see ECF Nos. 49-4, 49-5, 49-6), however, and even his role of running the district's credit recovery program (see ECF No. 41-1 at PageID 297), when viewed in the light most favorable to him, simply do not demonstrate district-wide leadership that is substantially identical to Dr. Ramirez's role.  Moreover, Plaintiff's role included a focus on virtual and blended-learning environments that Dr. Ramirez's role did not, nor was Dr. Ramirez a school principal.  (ECF No. 49-9 at PageID 663–64; ECF No. 60-3 at PageID 902.)

Although Plaintiff's evidentiary burden is not heightened at this stage, the evidence already adduced fails to establish the requisite identity between Plaintiff's and Dr. Ramirez's roles.  The Court finds that this insufficiency dooms Plaintiff's claim that he and Dr. Ramirez were similarly situated at the pretext stage:

> If the treatment of other employees is to show that the proffered reason for a plaintiff's treatment is not the real reason for that treatment, the comparison must be apples to apples. If different supervisors treat different employees with different responsibilities differently for the same conduct, it doesn't follow that discrimination motived the disparate treatment. It might be that the supervisors took differing views of the conduct. Or perhaps the different job responsibilities demanded different behavior. In other words, requiring employees to be similarly situated removes confounding variables such as supervisor discretion and job-duty mismatch. The uncertainty those variables create has no place at the pretext stage, which imposes a higher threshold than the prima facie stage does.

<u>Kinch v. Pinnacle Foods Grp., LLC</u>, 758 F. App'x 473, 479 (6th Cir. 2018).

Thus, Plaintiff has failed to establish pretext as to his sex discrimination claim, and Defendant's Motion for Summary Judgment is hereby GRANTED with respect to this claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED**, this 15th day of December, 2021.

 /s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE